UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
CATLIN SPECIALITY INSURANCE
COMPANY,
                              Plaintiff,

                 -against-

QA3 FINANCIAL CORP.,
                             Defendant.
------------------------------------------------------------ X

10 Civ. 8844 (LGS)

ORDER & OPINION

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 7/19/13

LORNA G. SCHOFIELD, District Judge:

       Plaintiff/Counter-defendant Catlin Specialty Insurance Company ("Catlin") brought this declaratory judgment action against Defendant/Counter-plaintiff, QA3 Financial Corporation ("QA3"), a broker-dealer financial services corporation, to determine the meaning of the parties' insurance contract. QA3 asserted counterclaims for breach of contract and bad faith. On December 19, 2012, District Judge Jesse Furman granted Catlin's motion to dismiss QA3's counterclaim for bad faith. On March 22, 2013, the case was transferred to this Court. On May 7, 2013, the parties cross-moved for summary judgment. For the reasons set forth below, Plaintiff's and Defendant's motions for summary judgment are denied.

I. Background and Facts

       Catlin issued a Broker/Dealer and Registered Representative Professional Liability insurance policy (the "Policy") to QA3, with a policy period from November 1, 2008 to November 1, 2009. Pursuant to the Policy, Catlin agreed to insure against claims made against QA3 "for a Wrongful Act committed solely in the rendering or failure to render Professional Services for a client." "Professional Services" include "the sale, attempted sale or servicing of Securities … ." Clients of QA3 sustained losses on private placements, which the parties and the Policy use as a shorthand term for securities sold in a private placement, i.e, a non-public

offering of securities that are exempt from registration under the Securities Act of 1933. (FINRA Rule 5122(a)(4)).  QA3's clients commenced arbitrations and lawsuits against QA3, alleging failure to undertake adequate due diligence.  QA3 submitted notice to Catlin for the claims against it, which neither party disputes are covered under the policy.  In response to QA3's claims, Catlin advised QA3 that under its interpretation of the Policy's Amended Definition of Securities Endorsement (the "Endorsement") the aggregate limit for claims arising out of private placements was $1,000,000.  QA3, however, believes that the limit applies only to specifically enumerated private placements listed in the Endorsement and that otherwise an aggregate limit of $7,500,000 should apply.

## II. Legal Standard

### A. Summary Judgment

Summary judgment is appropriate only where the record before the court establishes that there is no "genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The Court must construe the evidence in the light most favorable to the non-moving party and must draw all reasonable inferences in the non-moving party's favor.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *In re "Agent Orange" Prod. Liab. Litig.,* 517 F.3d 76, 87 (2d Cir. 2008).  A motion for summary judgment should be denied "if the evidence is such that a reasonable jury could return a verdict" in favor of the non-moving party.  *NetJets Aviation, Inc. v. LHC Commc'ns, LLC,* 537 F.3d 168, 178–79 (2d Cir. 2008).

### B. Contractual Interpretation

Under New York law, "an insurance contract is interpreted to give effect to the intent of the parties as expressed in the clear language of the contract." *Parks Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.,* 472 F.3d 33, 42 (2d Cir. 2006); *see also Vill. of Sylvan*

*Beach v. Travelers Indem. Co.,* 55 F.3d 114, 115 (2d Cir. 1995). "When the provisions are unambiguous and understandable, courts are to enforce them as written." *Parks Real Estate*, 472 F.3d at 42 (citing *Goldberger v. Paul Revere Life Ins. Co.,* 165 F.3d 180, 182 (2d Cir. 1999)). "The initial interpretation of a contract is a matter of law for the court to decide." *Morgan Stanley Grp. Inc. v. New England Ins. Co.,* 225 F.3d 270, 275 (2d Cir. 2000) (quotations omitted).

"Part of this threshold interpretation is the question of whether the terms of the insurance contract are ambiguous." *Parks Real Estate*, 472 F.3d at 42. "It is well settled that [a] contract is unambiguous if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion." *White* v. *Continental Cas. Co.*, 9 N.Y.3d 264, 267 (2007) (brackets in original, additional citation and internal quotation marks omitted). Conversely, "[a]n ambiguity exists where the terms of an insurance contract could suggest 'more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" *Parks Real Estate*, 472 F.3d at 42.

Under the doctrine of *contra proferentem,* if the terms of an insurance policy are ambiguous, "any ambiguity must be construed in favor of the insured and against the insurer." *White,* 9 N.Y.3d at 267. "However, where each party has submitted extrinsic evidence to support its interpretation of the insurance contract, the parties create an issue of fact that precludes application of contra proferentem at the summary judgment stage." *Core-Mark Int'l Corp. v. Commonwealth Ins. Co.*, No. 05 Civ. 183, 2006 WL 2501884, at *7 (S.D.N.Y. Aug. 30, 2006) (quotations and citations omitted).

**III. Discussion**

The parties' dispute centers on the Endorsement, which amends a form insurance policy. The Endorsement retains the Policy's broad and general definition of Securities, but also specifies that private placements and certain specified investments are included in the definition:

> "stocks, bonds, private placements, including Medical Capital products, 1031 exchanges, REITs, The Forward Funds, The Diligent Asset Diversification Fund, LLC, Maple Key, Taurus Fund, limited partnerships, including Ironwood Partners, L.P., Mountain Capital Partners Natural Resources Fund, L.P., Icahn Partners, L.P., Triumph Multi-Series Fund, Calhoun Market Neutral Fund, and other investments as defined by the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Company Act of 1940 or the Investment Advisors Act of 1940, and any amendments thereto, other than variable life insurance, universal life insurance, whole life insurance, variable annuities, flexible annuities, scheduled premium annuities and mutual funds."

In the critical provision at issue here, the Endorsement reduces the aggregate limit on liability from $7.5 million to $1 million as to claims relating to certain investments:

> "It is further understood and agreed that with respect to any Claims arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving private placements, The Forward Funds, The Diligent Asset Diversification Fund, LLC, Maple Key, Taurus Fund, and Triumph Multi-Series Fund, and the Calhoun Market Neutral Fund … [the aggregate liability is $1,000,000]."

The final two paragraphs of the Endorsement, while not directly at issue here, are relevant because of how they are drafted; one refers to a specific fund, and the other refers to all private placements. They provide:

> "It is further understood and agreed that with respect to any Claims arising out of, based upon, or in consequence of, directly or indirectly resulting from or in any way involving the Calhoun Market Neutral Fund, the Registered Representative must have successfully completed a program of study, seminar, training session or any other educational program concerning the sales and servicing of hedge funds approved and authorized by the Broker/Dealer and must provide proof of satisfactory completion prior to the training program or the inability to provide proof of having successfully completed the training program precludes coverage under the Policy for Claims arising out of, based upon or in consequence of,

> directly or indirectly resulting from or in any way involving the Calhoun Market Neutral Fund.
>
> It is further understood and agreed as a condition to coverage under [the Policy] for private placements, the Insured Broker Dealer must provide written proof that the private placement transaction at issue in the Claim had undergone due diligence scrutiny by an independent outside consultant before the Insured Broker Dealer authorized its registered representative force to offer the private placement to Clients of the Insured Broker Dealer."

Catlin argues that the $1 million limit in the Endorsement applies to all private placements. QA3 argues that the $1 million limit applies only to the six enumerated funds that follow "private placements [comma]" and that otherwise, the $7.5 million limit applies.

Catlin argues that to interpret the $1 million limit as applicable only to the six enumerated funds would read the term "private placements [comma]" out of the agreement, and that "private placements" is a general term, onto which the list of funds is added. Catlin urges the Court to apply the canon of construction *ejusdem generis*. "Under the rule of *ejusdem generis,* where general words follow an enumeration of specific items, the general words are read as applying only to other items akin to those specifically enumerated." *Harrison v. Ppg Indus.,* 446 U.S. 578, 588 (1980). Catlin further argues that because the contract later uses the term private placements without one of the funds listed in the limiting paragraph, and uses the name of one of the funds without the term private placements, it is clear that the parties meant for the terms to be read disjunctively.

QA3 argues that the $1 million limit applies only to the six listed funds, because otherwise there would have been no need to list the six funds (all of which are private placements and were known by the parties to be private placements), when the catch-all term would have been sufficient. QA3 urges the court to apply the canon of construction *expressio unius est exclusion alterius. Expressio unius* means "the mention of one thing implies the exclusion of the other," *Cordiano v. Metacon Gun Club, Inc.,* 575 F.3d 199, 221 (2d Cir. 2009).

The contract is susceptible to both interpretations.  Neither side is persuasive in arguing that the contract is unambiguous.  On the face of the agreement, it is unclear whether the provision means "including, but not limited to" the six funds that follow "private placements [comma]" or whether it means "private placements as follows" limiting the provision to the six private placements that follow the general term.  Neither a plain reading, nor application of the canons of construction urged by the parties, is sufficient to render the contract unambiguous.  While the grammatical reading of the sentence suggests Catlin's interpretation is the better one, it is not unambiguous, and an insured seeking to exclude coverage must "establish that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case.'"  *Inc. Vill. of Cedarhurst,* 89 N.Y.2d at 298.

Because the contract is ambiguous, the Court may look to extrinsic evidence in order to divine the meaning of the contract, reading the evidence on each motion in the light most favorable to the non-moving party.  Catlin presents the testimony of a former QA3 vice president and compliance officer, and his contemporaneous interpretation of the contract, both of which support Catlin's reading of the contract.  QA3 presents evidence of prior versions of the Endorsement in contracts with other insurers that were given to Catlin for reference, which added and subtracted certain funds from the list of funds in the limiting paragraph.  QA3 argues that this means the list of funds that followed the term private placement was restrictive, as there would be no reason to move them in and out of the list otherwise.  While the evidence presented by both sides is probative, none of the extrinsic evidence is sufficient, when read in a light most favorable to the non-moving party, to find that there are no issues of material fact remaining.  *See JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009).  Accordingly, questions of fact remain for the factfinder.

**IV. Conclusion**

For the reasons stated above, the motions for summary judgment are denied. The Clerk is directed to close the motions at docket numbers 88 and 92.

SO ORDERED.

Dated: July 19, 2013
      New York, New York

                                              LORNA G. SCHOFIELD
                                       UNITED STATES DISTRICT JUDGE